UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRADLEY P. COUSINS,

       Plaintiff,

                                                             File No.  1:11-CV-1196

v.

                                                             HON. ROBERT HOLMES BELL

HASTINGS MANUFACTURING CO., LLC
a Michigan limited liability company,

       Defendant.
_____/

**O P I N I O N**

       Plaintiff filed this action against his former employer, alleging breach of contract and violation of the Family Medical Leave Act.  This matter is before the court on Defendant's motion for summary judgment on the FMLA claim and for partial summary judgment on the contract claim. (Dkt. No. 29.)  For the reasons that follow, Defendant's motion is granted as to Plaintiff's FMLA claim and as to Plaintiff's claim that his equity should be calculated on the basis of fair market value.  Defendant's motion for summary judgment is denied in all other respects.

**I.**

       Defendant Hastings Manufacturing Co., LLC (Hastings-US) is a manufacturer of piston rings for the internal combustion industry.  Hastings-US is headquartered in Hastings, Michigan.  Plaintiff Bradley P. Cousins entered into an Employment Agreement with

Hastings-US on August 20, 2009, for an initial term beginning October 1, 2009, through December 31, 2012. (Def. Ex. 1, Pl. Ex. A, Agr't.) The Employment Agreement provided that Cousins would be employed by Hastings-US as President of Hastings Manufacturing East (Hastings-East) in Changzhou, China. Hastings-East is a wholly-owned subsidiary of Hastings Asia, a Hong Kong holding company held by Hastings-US. The Employment Agreement provided that Cousins would report directly to Frederick A. Cook, Chief Executive Officer of Hastings-US. (Agr't ¶ 2; Cook Dep. 75.) Cousins spent the first three months of his employment in Michigan to allow for formation of a strategic plan for Hastings-East and for training in Defendant's piston ring manufacturing process. (Agr't ¶ 2; Cousins Dep. 20.) Cousins began working in China on January 1, 2010.

In April 2010, Cousins's wife was diagnosed with ovarian cancer and returned to the United States for treatment. (Pl. Ex. 6, 4/12/10 email from Cousins to Cook.) Cousins informed Cook that he planned to travel to the United States once a month in mid-June, July, and August, and possibly September to care for his wife. Cook responded that it would not be a problem. (Def. Ex. 7, Cousins-Cook 5/18/10 emails.)

In September 2010, Hastings-US reassigned some of Cousins's direct reports to individuals at Hastings-US. (Cook Dep. 172-73, 180.)

Cook visited the Hastings-East factory in September 2010. Cousins testified that when he told Cook during the visit that his wife needed further treatments, Cook made it very clear that Cousins needed to be at the factory in China. (Cousins Dep. 50, 56.) After the

2

September visit, Cook wrote Cousins a lengthy email outlining management problems he had observed and demanding improvements. (Def. Ex. 8.) In reply, Cousins expressed surprise at the abrupt change from previous emails that had been very complimentary of his work. (*Id.*) He also promised to deliver the results Cook was demanding. (*Id.*)

Cook returned to China in October with a termination agreement prepared by counsel in hand. (Cook Dep. 52.) Although he came to China prepared to terminate Cousins, Cook testified that because Cousins's performance had improved and there had been a turnaround at the factory, he decided not to terminate Cousins, and he told Cousins as much. (*Id.* at 52, 225.) Cousins, on the other hand, testified that did fire him, but gave him time to look for a new job. (Cousins Dep. 76, 118, 119.)

On October 1, 2010, Cousins began inquiring about purchasing equity. (Cook Dep. 51-52.) Cook responded that the Operating Agreement sets the purchase price and that he would get him a valuation. (Cook Dep. 196.) Cook understood that Cousins had a right to equity, and that this right was not tied to performance. (Cook Dep. 201, 227-28). Nevertheless, during Cook's October visit, he advised Cousins that the performance of the facility did not warrant Cousins's earning of equity. (Cook Dep. 52.) On October 25, Cook told Cousins he would bring the equity documents on his next trip to China. (Cook Dep. 196-97.) On October 26, 2010, Cook's partners asked him to have Cousins sign a document agreeing that he would not be offered equity until his performance improved. (Ex. DD.) Cook visited the China factory in November, but he did not bring the promised equity

3

documents. (Cook Dep. 198.) Cook was still of the opinion that Cousins had not made sufficient improvements to warrant equity. (Cook Dep. 79, 198.) Cousins never received the Operating Agreement or other information necessary for him to purchase the equity. (Cook Dep. 57; Zwiernikowski Dep. 66-67.)

On November 28, 2010, Hastings requested Cousins to sign a new employment contract with Hastings-East that would supplement Cousins's contract with Hastings-US. The new contract, which was backdated to November 28, 2009, eliminated Cousins's definite term of employment, his entitlement to equity, and the termination benefit. (Pl. Ex. EE, Zwiernikowski, Dep 23-24). Cousins did not receive his four paychecks in January and February 2011. (Cook Dep. 244-45; Cousins Dep. 109-110). According to Defendant, Cousins's pay was withheld until Hastings-US received the new employment contract that would enable Cousins to be paid by Hastings-East rather than Hastings-US. (Zwiernikowski Dep. 53-54.)

In early 2011, Cousins began negotiating with Nexans AmerCable for a new job. He signed an employment agreement with AmerCable in mid-April 2011, resigned from Hastings on May 11, 2011, and began work for AmerCable on June 1, 2011, as its Global Supply Chain director. (Cousins Dep. 66-67.)

Cousins filed this action alleging breach of contract and FMLA violations.

## II.

Defendant has filed a motion for summary judgment on Cousins's FMLA claim, and

a motion for partial summary judgment on Cousins's breach of contract claim. The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If Defendant carries its burden of showing there is an absence of evidence to support a claim, Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, "the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas and Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

**A. FMLA Claim**

Defendant has moved for summary judgment on Cousins's FMLA claim on three

5

independent grounds. Defendant's first contention is that the FMLA does not extend coverage to employees working outside the United States' borders.

The FMLA provides entitlement to health care leave for "eligible employees." 29 U.S.C. § 2611(2)(A). The Department of Labor regulations provide that an "eligible employee" is one who has been employed for 12 months for at least 1,250 hours at a worksite where 50 or more employees are employed within 75 miles of the worksite. 29 U.S.C. § 825.110(a). The regulations further define "eligible employee" to mean an employee who "is employed in any State of the United States, the District of Columbia or any Territories or possession of the United States." 29 C.F.R. § 825.800. The definition of "eligible employee" specifically excludes "any employee employed in any country other than the United States or any Territory or possession of the United States." (*Id.*) Employees who are employed outside of the United States "are not counted for purposes of determining employer coverage or employee eligibility." 29 C.F.R. § 825.105(b). In a Department of Labor (DOL) opinion letter addressing the extraterritoriality exemption, the DOL specifically concluded that "employees stationed full-time overseas in a foreign country on one and two year employment contracts would not be eligible for the benefits of the FMLA while working overseas." DOL Op. Lts. Oct. 18, 1993, 1993 WL 939398. *See also Souryal v. Torres Advanced Enter. Solutions, LLC*, 847 F. Supp. 2d 835, 839 (E.D. Va. Feb. 6, 2012) (holding that contract worker at the US embassy in Iraq was not entitled to any rights under the FMLA); *Hodge v. United Airlines*, 821 F. Supp. 2d 180, 199 (D.D.C. 2011) (holding that

6

a United Airlines flight attendant who was assigned to work out of Hong Kong did not have a claim under the FMLA); *Freeman v. Sikorsky Aircraft Corp.*, No. 04-CV-0506, 2006 WL 2385311, at *2 (N.D. Okla. Aug. 17, 2006) (rejecting a claim by the manager of the defendants' base in Manaus, Brazil, that his "worksite" was in the United States and holding that he was not an eligible employee for purposes of the FMLA).

Cousins was stationed full-time in China as President of Hastings-East to run the Changzhou factory. Cousins contends that, notwithstanding the clear extraterritoriality exemption to the FMLA, and notwithstanding the fact that he was physically located in China for his employment, he was nevertheless an "eligible employee" under the FMLA. In support of this contention, Cousins contends that his "worksite" was the Hastings-US headquarters in Michigan, rather than the factory in China. The regulations define "worksite" as the "site to which [traveling employees] are assigned as their home base, from which their work is assigned, or to which they report." *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 558 (6th Cir. 2006) (quoting 29 C.F.R. § 825.111(a) (2)). *See also* 29 C.F.R. § 825.111(a) ("An employee's worksite under FMLA will ordinarily be the site the employee reports to or, if none, from which the employee's work is assigned."). Cousins has presented evidence that he reported to Hastings, that his work was assigned from Hastings, and that any backup for him would come from the pool of executives in Hastings, Michigan.

Cousins's reliance on 29 C.F.R. § 825.111 is misplaced. The term "worksite" is defined in § 825.111 for purposes of determining whether 50 employees are employed within

7

75 miles (the 50/75 rule), and for purposes of determining the worksite of an employee with no fixed worksite. This regulation does not purport to displace or override the extraterritoriality exception. In fact, where the regulations describe the 50/75 rule as a requirement for "eligible employee," they specifically direct the reader to § 825.105(b) regarding employees who work outside the United States.

Although the FMLA does not address extraterritoriality, the extraterritoriality exemption found in the regulations is consistent with the general presumption against extraterritoriality. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'").

The court concludes that because Cousins worked outside of the United States, he was not an eligible employee for purposes of the FMLA. In light of this conclusion, the Court need not address Defendant's alternative arguments that Cousins did not meet the one-year employment eligibility requirement, and that Cousins was never denied FMLA leave.

**B. Breach of Contract**

Defendant seeks summary judgment on its contention that, because Cousins resigned from his employment, he is not entitled to wages for the full term of his employment term.

Viewing the facts in the light most favorable to Cousins, the Court finds that there are questions of fact that preclude a determination at this time as to whether Cousins resigned, or whether he was constructively discharged. This is an issue of fact for trial.

Defendant contends that even if Cousins is successful on his claim that he was constructively discharged, Defendant is nevertheless entitled to partial summary judgment on some of Cousins's damages claims.

1. <u>Severance and Lost Wages</u>

Defendant contends it is entitled to partial summary judgment on Cousins's claim for both severance and for lost wages because an employee cannot collect both severance and damages for lost wages as a matter of law. *See Laugesen v. Anaconda co.*, 510 F.2d 307, 317 (6th Cir. 1975) (holding that severance pay that would not have been received but for termination should be deducted from lost wages); *Jontig v. Bay Metro. Transp. Auth.*, 178 Mich. App. 499, 504 (1989) (holding that where contract provided for only sixty days severance pay, the arbitrator exceeded his power by awarding damages in excess of sixty days of pay upon the plaintiff's termination).

> The Employment Agreement provides for Termination Benefits as follows:
>
> If Executive is terminated for any reason or the Company fails to comply with the [sic] any part of this contract, Executive shall be entitled to receive the following severance payment . . . which shall be deemed compensation for Executive's past services to Company: Executive . . . shall be paid his earned but unpaid Base Salary through the last day of employment, plus his pro-rated Base Salary for an additional six (6) months following the last day of employment, plus any accrued and unused vacation.

(Agr't § 4.)

Cousins contends that the parties did not intend Cousins's termination benefit of $75,000 to preclude Cousins from collecting other damages. In support of this argument,

9

Cousins notes that the Employment Agreement specifically states that the payment "shall be deemed compensation for Executive's *past services* to [the] Company." (Agr't, § 4 (emphasis added).) Cousins's request for lost wages addresses lost *future* wages.

The Employment Agreement provides for Termination Benefits not only for termination, but also if the Company fails to comply with "any part of this contract." It contains an explicit reference to "past services" and does not indicate that it is the sole remedy for wrongful discharge. The Court finds that there is an issue of fact for trial as to Cousins's ability to collect for both lost salary and severance. There are also questions of fact for trial regarding additional damages and Cousins's mitigation of damages.

2. Equity Shares

Defendant concedes that there is a question of fact for trial as to whether Cousins exercised his right to purchase equity under Section 3(c) of his Employment Agreement. However, Defendant contends that if Cousins is entitled to equity shares, the amount of recovery must be calculated on the basis of Hastings's net book value rather than on the fair-market valuation.

Section 3(c) of the Employment Agreement provides:

Earned Equity. After the first twelve months of employment the Executive shall be entitled to common stock shares at shareholders equity price at the time of purchase (per section 3.6 of the Operating Agreement) in the company amounting to 2% of the total shares of the company which can be attained by paying cash or through an interest deferred loan from the company. . . .

(Agr't § 3(c).)

The Operating Agreement provides that in the event of a Trigger Event, the member agrees to sell all of his equity in the Company for the Agreement Price. (Op. Agr't § 6.4(a).) If the Trigger Event occurs within five years of the date that the member started working for the Company, the Agreement Price is the Company's net book value. (*Id.* at § 6.4(e)(1).) If the Trigger Event is five or more years after the date that the member started working for the Company, the Agreement Price is the Company's fair market value on a going concern basis at the month end prior to the month of the Trigger Event. (*Id.* at § 6.4(e)(2).) The Company's termination of a member's employment, with or without cause, or the Member's termination of his employment, is a Trigger Event. (*Id.* at § 6.4(b)(1).)

Cousins contends that the Employment Agreement only references § 3.6 of the Operating Agreement for purposes of determining the purchase price of the equity. He contends that the Employment Agreement does not define the equity sale price or reference § 6.4 of the Operating Agreement.

The Court finds that in light of Cousins's agreement to purchase equity pursuant to the Operating Agreement, and the Employment Agreement's silence with respect to the sale price of the equity, there is no question of fact that § 6.4 of the Operating Agreement governs the sale price of the equity. None of Cook's statements regarding the "unlimited potential in the private equity world," his respect for Cousins's insistence on having an opportunity to purchase equity, or having Cousins "put skin in the game," (Cook Dep. 30, 48, 64) suggests that the sales price of the equity upon in the event of termination would be governed

11

by anything other than the Operating Agreement.

Cousins contends that even if the Operating Agreement governs the sale price, he is still entitled to the fair market value of the equity because Defendant's breaches of contract were the only reason Cousins did not attain the five years of service that would make him eligible for fair market value. Cousins contends that Hastings cannot take advantage of its own breach to artificially deflate the value of Cousins's equity. *See In re Brown*, 342 F.3d 620, 632 (6th Cir. 2003) (noting that a plaintiff is entitled to damages that "arose naturally from the breach or were in contemplation of the parties at the time the contract was made"); *Ebling v. Maasco Corp.*, 79 Mich. App. 531, 534-35 (1977) (holding that an employer cannot wrongfully terminate an employee and then point to the termination as a reason the employee cannot recover damages for lost stock options).

Cousins's argument is not persuasive because the Operating Agreement explicitly contemplated a termination without cause. The Operating Agreement defined the sale price of the equity without regard to whether the member was terminated or resigned, and regardless of whether the termination was with or without cause. In other words, breaches of the employment agreement were contemplated and addressed in the Operating Agreement. Damages in excess of net value if employment was terminated before the end of five years was not contemplated by the parties at the time the contract entered into. Defendant is accordingly entitled to partial summary judgment on Cousins's claim that he is entitled to fair market value for his equity. The Court finds, as a matter of law, that if Cousins is entitled

to the value of his equity, the value of that equity will be calculated based on the Company's net book value rather than on fair market value.

### III.

For the reasons stated herein, the Court will grant Defendant's motion for summary judgment on Cousins's FMLA claim and on Cousins's claim that his equity should be calculated on the basis of fair market value. Defendant's motion for summary judgment is denied in all other respects.

Dated: December 21, 2012 /s/ Robert Holmes Bell
ROBERT HOLMES BELL
UNITED STATES DISTRICT JUDGE